UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| LISLE A. WISHART, | ) | CIV. 11-4075-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER AFFIRMING THE DECISION |
| | ) | OF THE COMMISSIONER |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Lisle A. Wishart Jr., moves for reversal of the Commissioner of
Social Security's decision denying his application for disability insurance
benefits under Title II of the Social Security Act (SSA) for the time period
between May 30, 2006, and June 30, 2007. The Commissioner opposes this
motion. The court affirms.

**PROCEDURAL HISTORY**

On November 24, 2006, Wishart filed a claim for Disability Insurance
Benefits under Title II of the SSA, and alleged a disability onset date of May 30,
2006. AR 150.[1] The Social Security Administration initially denied this claim on
February 14, 2007, and again upon reconsideration on May 7, 2007. AR 82,
87. On July 10, 2007, Wishart requested a hearing before an Administrative

---

[1] All citations to "AR" refer to the appropriate page of the administrative
record.

Law Judge (ALJ). AR 89. On September 25, 2008, the ALJ held a hearing on Wishart's claim. AR 366-411. On December 30, 2008, the ALJ determined that Wishart was not disabled at any time between May 30, 2006, and June 30, 2007 (the date last insured). AR 64-78.

On July 27, 2009, the Appeals Council reviewed the December 30, 2008, ALJ decision and remanded Wishart's claim back to the ALJ for further administrative proceedings. AR 79-81. The Appeals Council directed the ALJ to obtain further medical evidence, reconsider the treating physician's opinion, reevaluate Wishart's subjective complaints of pain, and consider consulting a vocational expert. AR 81. On December 17, 2009, the ALJ held another hearing. AR 34. Tom Audet, a vocational expert, testified at this hearing. AR 34. On January 20, 2010, the ALJ again found that Wishart was not disabled during the period of May 30, 2006, through June 30, 2007. AR 20.

On January 7, 2011, Wishart filed a timely request with the Appeals Council to review the ALJ's January 20, 2010, decision. AR 5. The Appeals Council denied this request on April 7, 2011. AR 1. Thus, the unfavorable January 20, 2010, decision became the Commissioner's final decision. AR 1. On June 6, 2011, Wishart filed a timely civil action in this court, alleging that the Appeals Council's decision was erroneous. Docket 2.

## FACTS

Born on December 12, 1952, in Los Angeles, California, Lisle Arthur Wishart Jr., was 53 on his alleged disability onset date and 54 on his date last insured. AR 5, 41. Wishart obtained approximately 13 years of education, and graduated from high school in 1972. AR 42, 200. Wishart did not attend special education classes. AR 200. Wishart went to a junior college and received a certificate in computer training in 1980. AR 293. Wishart subsequently attended a national training institute for computer networking. AR 293. At one point, Wishart also had a real estate license, although this license has not been maintained. AR 42.

Wishart's work history and longitudinal earnings record are varied. Between 1969 and 2006, Wishart worked as a telemarketer, hardware salesman, computer support analyst, computer technician, food delivery driver, newspaper delivery driver, and real estate agent. AR 203, 206, 263. Wishart earned no recorded income during six of these years and earned $7 in 1969. AR 160.

Wishart worked for Schwan's Home Services as a delivery driver from December 15, 2005, until May 30, 2006, his alleged onset date. AR 203. In an April 9, 2007, letter to the Social Security Administration, Wishart explained that during the last week of his employment with Schwan's "[his] pain had progressed to the point [he] was hobbling and stumbling as [he] attempted to

3

walk from door to door doing [his] sales work." AR 232. Wishart stopped

showing up for work in May 2006, and Schwan's terminated his employment.

AR 386, 390-91.

## I.   Esophageal and Back Problems

Wishart had an esophageal problem when he was a child. AR 294.

Wishart was hospitalized multiple times and underwent dilation procedures in

an effort to combat this esophageal problem. AR 294, 307. Wishart has

identified his esophageal problem as "achalasia."[2] AR 339. The relevant medical

records suggest that Wishart's history of esophageal complications exposes him

to a greater risk of esophageal cancer. AR 304. Aside from this, however,

Wishart's achalasia does not bring forth any considerable difficulties or

complications, except for "mild" dysphagia.[3] AR 307.

---

[2] "Achalasia is a rare disorder of the esophagus, the tube that carries food from the throat to the stomach. It is characterized by enlargement of the esophagus, impaired ability to push food down toward the stomach (peristalsis), and failure of the ring-shaped muscle at the bottom of the esophagus, the lower esophageal sphincter (LES), to relax." WebMD, http://www.webmd.com/heartburn-gerd/achalasia (last visited August 21, 2012).

[3] Dysphagia is difficulty swallowing, and is generally indicative of throat and/or esophageal problems. WebMD, http://www.webmd.com/digestive-disorders/tc/difficulty-swallowing-dysphagia-overview (last visited August 21, 2012).

Wishart underwent a laminectomy[4] at L5-S1 due to a ruptured disc[5] when Wishart was 22 years old. AR 286. In 2003, Wishart reported that he occasionally has back pain and cannot do "stoop labor." AR 294.

## II.    Psychological Disorders

In 2003, Wishart's vocational rehabilitation counselor, Gail Nagelhout, referred Wishart to Michael J. McGrath, Ph.D., a licensed psychologist. AR 291. After a psychological evaluation on June 14, 2003, Dr. McGrath opined that Wishart had a reading disorder,[6] a mathematics disorder, an expressive writing disorder, a depressive disorder,[7] avoidant personality features, and psychological and environmental stress. AR 298. Wishart's intellectual metrics, VIQ (119), PIQ (92), and FSIQ (108), suggested learning disabilities in the areas of reading, expressive writing, and mathematics. AR 296-97. Consistent with

---

[4] "During a laminectomy, a surgeon removes the rear portion of one or more spinal bones (vertebrae), bone spurs, and ligaments that are pressing on nerves." WebMD, http://www.webmd.com/back-pain/guide/laminectomy-surgery-before-during-and-after (last visited August 21, 2012).

[5] "A ruptured disc occurs when the jellylike material (nucleus) inside the disc breaks through the outer shell (capsule or annulus) of the spinal disc." WebMD, http://www.webmd.com/a-to-z-guides/ruptured-discs-topic-overview (last visited August 21, 2012).

[6] Despite McGrath's finding that Wishart has a reading disorder, Wishart asserted that he experiences no difficulty reading the newspaper or science fiction novels. AR 293.

[7] While Wishart did not feel incapacitated by his depression, his symptoms included "lethargy, diminished motivation, diminished interests and ability to think, and worse feelings about himself," such as guilt stemming from his inability to pay child support. AR 294-93.

the avoidant personality features assessment, Wishart identified his wife as his only friend, but later indicated that he might have one friend from church. AR 293. Dr. McGrath concluded that Wishart should avoid work that requires one to be socially facile, possess social confidence, or interact with others. AR 298. Further, Dr. McGrath recommended that Wishart pursue work with "less physical requirements to it." AR 298.

In a February 13, 2007, Psychiatric Review Technique Form, Dr. Richard Gunn found that Wishart had medically determinable mathematics and reading disorders (organic mental disorders), as well as avoidant personality disorder. AR 265-72. Ultimately, Dr. Gunn found that these disorders were not severe.[8] AR 265; 277. Dr. Gunn opined that "[Wishart's] ability to perform normal job related tasks prior to his Date Last Insured, from a psychological standpoint, would not have been severely limited." AR 277. Dr. Doug Soule, Ph.D., D.D.S., certified these findings and conclusions.[9] AR 280.

_____

[8] Specifically, in analyzing Wishart's mental impairments, Dr. Gunn considered the "A," "B," and "C" listing criteria of organic mental disorders and personality disorder. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Dr. Gunn analyzed Wishart's organic mental disorders under 12.02 and his personality disorder under 12.08. *Id.*

[9] This certification pertains to "the assessment of 2-13-2007." AR 280. Presumably, Dr. Soule was referring to Dr. Gunn's 2/13/2007 assessment, and not Dr. Entwistle's 2/13/2007 assessment, as Dr. Soule is a Ph.D. as opposed to an M.D.

### III.   Fibromyalgia with Chronic Fatigue Syndrome and Rib Tip Syndrome

Wishart was diagnosed with fibromyalgia[10] in his early thirties, after seeking medical attention for various aches and pains. AR 286. In February of 1998, Dr. Jarstad referred Wishart to L. Ray Bryant, M.D., a rheumatologist at the Great Plains Clinic. AR 286. Wishart first saw Dr. Bryant on February 12, 1998, and Dr. Bryant's impression was that Wishart was "[a] 45-year-old male with diffuse musculoskeletal pain, sleep disturbance, and multiple tender points on exam compatible with fibromyalgia." AR 286-87. More specifically, Dr. Bryant found that 16 out of 18 tender points were present on a tender point test.[11] AR 287. Wishart's then-prevailing medication regimen consisted of Darvocet-N 100[12] (3-4 times a day), Restoril[13] (30 mg at night), Motrin (800 mg

---

[10] "Fibromyalgia is a disorder of unknown cause characterized by chronic widespread aching and stiffness, involving particularly the neck, shoulders, back, and hips, which is aggravated by use of the affected muscles." *Stedman's* at 725.

[11] "[P]oint tenderness must be found in at least 11 of 18 specified sites" in order to serve as the basis for a fibromyalgia diagnosis. *Stedman's Medical Dictionary* 725 (28th ed. 2006). There is no diagnostic laboratory test ("such as X-rays or blood tests") for fibromyalgia, however, and treating physicians "diagnose fibromyalgia based on all the patient's relevant symptoms . . . no longer just on the number of tender points." American College of Rheumatology, http://www.rheumatology.org/practice/clinical/patients/diseases_and_conditions/fibromyalgia.asp (last visited August 21, 2012). *See also Wuerth v. Astrue*, No. 8:06-CV-1353-T-30TBm 2008 WL 6802111, at *5 n.7 (M.D. Fla. 2008) ("There are no laboratory or other diagnostic tests for fibromyalgia so it must be diagnosed based on patient symptoms.").

[12] Darvocet-N 100 (or acetaminophen and propoxyphene) is used to relieve "mild to moderate" pain. Drugs.com, http://www.drugs.com/

2-3 times a day), melatonin[14] (3 at night time), vitamin C and vitamin E,

calcium (3 a day), a multivitamin, and Imodium (as needed). AR 287.

Dr. Bryant supplemented this regimen by prescribing Flexeril[15] (10 mg 1-2

hours before bedtime). AR 288. Additionally, Dr. Bryant administered two local

injections containing Celestone[16] (4.5 mg per injection), Marcaine[17] (2 cc per

injection), and Lidocaine[18] (2 cc per injection). AR 287.

---

mtm/darvocet-n-100.html (last visited August 21, 2012). It was taken off the market in 2010. *Id.*

[13] Restoril, a benzodiazepine, "affects chemicals in the brain that may become unbalanced and cause sleep problems (insomnia)." Drugs.com, http://www.drugs.com/restoril.html (last visited August 21, 2012).

[14] "Melatonin has been used to ease insomnia, combat jet lag, protect cells from free-radical damage, boost the immune system, prevent cancer, and extend life." Drugs.com, http://www.drugs.com/melatonin.html (last visited August 21, 2012).

[15] "Flexeril (cyclobensaprine) is a muscle relaxant. It works by blocking nerve impulses (or pain sensations) that are sent to your brain. Flexeril is used together with rest and physical therapy to treat skeletal muscle conditions such as pain or injury." Drugs.com, http://www.drugs.com/flexeril.html (last visited August 21, 2012).

[16] Celestone "is in a class of drugs called steroids . . . [and] prevents the release of substances in the body that cause inflammation." Drugs.com, http://www.drugs.com/mtm/celestone.html (last visited August 21, 2012).

[17] Marcaine (bupivacaine is the generic name) "is an anesthetic (numbing medicine) that blocks the nerve impulses that send pain signals to your brain," and is commonly used to treat spinal pain. Drugs.com, http://www.drugs.com /mtm/marcaine-hcl.html (last visited August 21, 2012).

[18] "Lidocaine is a local anesthetic (numbing medication). It works by blocking nerve signals in your body. Lidocaine injection is used to numb an

In a follow-up visit on March 4, 1998, Dr. Bryant reported that Flexeril improved Wishart's ability to fall asleep. AR 281. Dr. Bryant further reported that Wishart was experiencing an increased level of stress, and he believed this to be due to unemployment. AR 281. At this time, Wishart was doing mild aerobics, including stretching, bicycling, and walking. AR 281. Wishart stated that this exercise combated Wishart's stiffness, but it did not remedy Wishart's pain. Ar 281. Wishart's prevailing medication regimen was the same as during the February 12, 1998, visit (including the supplemental Flexeril), but also contained Neurotonin[19] (400 mg at bedtime). Dr. Bryant increased Wishart's Flexeril dosage, from 10 mg to 15 mg at bedtime, and he gave Wishart samples of Zostrix[20] cream to ameliorate Wishart's pain. AR 282.

On May 8, 1998, Wishart informed Dr. Bryant that Wishart's pain had decreased to a "manageable level" and Wishart believed that he could return to work. AR 284. In response, Dr. Bryant gave Wishart a prescription for higher-

---

area of your body to help reduce pain or discomfort caused by invasive medical procedures such as surgery, needle punctures, or insertion of a catheter or breathing tube." Drugs.com, http://www.drugs.com/mtm/lidocaine-injection.html (last visited August 21, 2012).

[19] Neurotonin (gabapentin) is used to treat epileptic seizures, nerve pain, and restless legs syndrome. Drugs.com, http://www.drugs.com/gabapentin.html (last visited August 21, 2012).

[20] Zostrix is a capsaicin topical "used for temporary relief of muscle or joint pain caused by strains, sprains, arthritis, bruising, or backaches." Drugs.com, http://www.drugs.com/mtm/zostrix.html (last visited August 21, 2012).

strength Zostrix cream. AR 285. Dr. Bryant also supplemented Wishart's medication with Ultram.[21] AR 285. Dr. Bryant hoped that Ultram would replace Wishart's Darvocet-N 100, because Wishart had been taking Darvocet-N 100 for nearly one year. AR 285.

Wishart began seeing Dr. Sayed Asif Shah, M.D., at Pioneer Memorial Viborg Medical Clinic in October of 2003. AR 339. On October 14, 2003, Dr. Shah noted that Wishart decided to obtain medical care through Pioneer Memorial because Wishart was unsatisfied with the Centerville Clinic's pain management. AR 328. Dr. Shah opined that Wishart had fibromyalgia and Wishart's pain intensity was "7-8/10." AR 327. In response to Wishart's description of his pain management, Dr. Shah prescribed Tylenol #3 (120 mg as needed) and Ultram (120 mg twice a day). AR 327.

After an August 20, 2004, visit, Dr. Shah noted that Wishart's pain was "5/10," and substituted Ultracet[22] for Ultram. AR 325. Approximately one month later, on September 23, 2004, Wishart told Dr. Shah that he could not afford Ultracet and asked about reverting to Ultram. AR 324. Dr. Shah canceled Wishart's Ultracet prescription and prescribed Ultram. AR 324.

---

[21] "Ultram (tramadol) is a narcotic-like pain reliever . . . used to treat moderate to severe chronic pain." Drugs.com, http://www.drugs.com/ultram.html (last visited August 21, 2012).

[22] Ultracet is a combination of acetaminophen and tramadol used to treat moderate to severe pain. Drugs.com, http://www.drugs.com/ultracet.html (last visited August 21, 2012).

On April 19, 2006, Dr. Shah reported that Wishart's pain was increasing due to Wishart's employment with Schwan's, which was "very physically active." AR 320. Dr. Shah altered Wishart's medication regimen, switching to Ultram ER[23] (200 mg once a day), Hydrocodone,[24] and Lunesta.[25] AR 320. On April 24, 2006, Wishart informed Dr. Shah that the new medication regimen was not adequately managing his pain. AR 320. In response, Dr. Shah doubled Wishart's Ultram ER (200 mg twice a day). AR 320.

On May 31, 2006, a day after Wishart's alleged onset date, Wishart visited Dr. Shah complaining of "general body pain and trigger point pain." AR 319. Wishart complained that the increased pain started on May 30, 2006, and he had been taking medication in excess of his prescription to compensate for the increased pain. AR 319. Dr. Shah discontinued Wishart's Tylenol #3 prescription, continued Duragesic patches,[26] and referred Wishart to Dr. John

---

[23] Ultram ER (extended-release) "is used to treat moderate to severe chronic pain when treatment is needed around the clock." Drugs.com, http://www.drugs.com/mtm/ultram-er.html (last visited August 21, 2012).

[24] "Hydrocodone is in a group of drugs called opioid pain relievers. An opioid is sometimes called a narcotic. . . . [Hydrocodone] is used to relieve moderate to severe pain." Drugs.com, http://www.drugs.com/vicodin.html (last visited August 21, 2012).

[25] "Lunesta is a sedative, also called a hypnotic. . . . Lunesta is used to treat insomnia. This medication causes relaxation to help you fall asleep and stay asleep." Drugs.com, http://www.drugs.com/lunesta.html (last visited August 21, 2012).

[26] "Duragesic is a skin patch containing fentanyl, an opioid pain medicine. . . . used to treat moderate to severe chronic pain." Drugs.com,

Hansen at the Sanford Chronic Pain Clinic. AR 318-19; Docket 13 at 4.[27]

Following the appointment, Dr. Hansen made no new recommendations. AR 316.

During an August 9, 2006, appointment with Dr. Shah, Wishart described his pain as "3/10 in intensity most of the time" and opined that "he cannot perform work that requires more physical exertion." AR 316. Wishart described generalized achiness, "especially [after] standing up from a sitting position." AR 316. Wishart reported that he could not stand for prolonged periods of time. AR 316. Dr. Shah renewed Wishart's prescriptions (Tramadol and Fentanyl), and stated that "[i]f no improvement, I will have him re-evaluated by a rheumatologist for further input in reference to his chronic fatigue syndrome." AR 315.

In a December 8, 2006, Function Report filled out by Claudia Young,[28] Wishart described his daily routine as heavily dependent upon pain medication. AR 214. Wishart required pain medication every morning and after physical activities, which were limited to non-heavy household chores, such as

_____

http://www.drugs.com/duragesic.html (last visited August 21, 2012).

[27] While the AR does not contain medical records of Wishart's appointment with Dr. Hansen, Dr. Shah recounted in his notes that "Dr. Hansen [was] concerned about the medication, especially the narcotics that [Wishart was] using. . . . and the meeting [between Wishart and Dr. Hansen] ended in a harsh tone." AR 316.

[28] Claudia Young is Wishart's wife. AR 223.

feeding the pets. AR 214. Wishart also reported that his pain interfered with sleeping, lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, memory, stair-climbing, using hands, completing tasks, concentrating, understanding, following instructions, and getting along with others. AR 215-19. At that time, Wishart was utilizing an unprescribed cane and an unprescribed brace/splint daily in order to facilitate physical activity. AR 220.

On October 11, 2007, Dr. Shah filled out a Multiple Impairment Questionnaire pertaining to Dr. Shah's professional interactions with Wishart. AR 330. In this questionnaire, Dr. Shah described Wishart's condition as "Myalgias,"[29] "Myositis,"[30] and "Chronic Fatigue Syndrome."[31] AR 330. Dr. Shah's prognosis was "Pain - [Wishart] has exercerbation [sic] of symptoms when dose of pain medications are decreased." AR 330. Dr. Shah, when asked to identify positive clinical findings in support of the diagnosis, stated that his opinion was based on "tender area (trigger points) at lumbar (lower) area, shoulders, neck, forearm, arms & hips." AR 330. Dr. Shah explained that

---

[29] A myalgia is an episode or zone of muscular pain. *Stedman's* at 1265.

[30] Myositis is "[i]nflammation of a muscle." *Stedman's* at 1275.

[31] "Chronic fatigue syndrome, sometimes called CFS, is a condition that makes you feel so tired that you can't do all of your normal, daily activities. There are other symptoms too, but being very tired for at least 6 months is the main one." WebMD, http://www.webmd.com/chronic-fatigue-syndrome/ chronic-fatigue-syndrome-topic-overview (last visited August 21, 2012).

Wishart's "constant, dull ache" increased with activity and physical exertion. AR 331-32. Dr. Shah, when asked to rate Wishart's pain on a scale of 0-10 (0 being none-to-trace and 10 being excruciating), evaluated Wishart's pain as a 6-7 (moderate-moderately severe). AR 332.

When asked to estimate Wishart's RFC, Dr. Shah wrote that Wishart could sit 2– 3 hours per day, stand or walk 1–2 hours per day, and that it would be necessary or medically recommended for Wishart to not sit continuously in a work setting. AR 332. Dr. Shah explained that Wishart had to get up and move after every 2–3 hours of sitting, and Wishart could not sit back down for up to 2–3 hours. AR 332-33. Dr. Shah also wrote that it would be necessary or medically recommended for Wishart not to stand or walk continuously in a work setting. AR 333. Dr. Shah opined that Wishart could frequently lift and/or carry zero to five pounds, occasionally lift five to twenty pounds, and never lift in excess of twenty pounds. AR 333. Dr. Shah opined that Wishart experienced some limitations in repetitive reaching, handling, fingering, and lifting, and in keeping his neck in a constant position. AR 333-34. Dr. Shah predicted that Wishart's symptoms would worsen if Wishart worked in a competitive environment. AR 334. Dr. Shah wrote that the preceding evaluation accurately described Wishart's condition as early as August 31, 2000. AR 336.

14

In a letter dated February 29, 2008, Dr. Shah stated that "[Wishart's]
pain management was basically achieved through Ultram and Hydrocodone,"
AR 339, although Dr. Shah did note that he had not physically seen Wishart
since July 2007. AR 340.

## ALJ DECISIONS

### I.    December 30, 2008: Unfavorable Decision

On December 30, 2008, the ALJ issued a decision denying Wishart's
claim for Title II disability benefits. AR 67-78. The ALJ analyzed Wishart's claim
utilizing a five-step sequential evaluation procedure.[32] AR 68. At step one, the
ALJ determined that Wishart did not engage in substantial gainful activity
between the alleged onset date and the date last insured. AR 70. At step two,

---

[32] 20 C.F.R. § 404.1520(a)(4)(i)-(v) provides that "(i) [a]t the first step, we
consider your work activity, if any. If you are doing substantial gainful activity,
we will find that you are not disabled. . . . (ii) At the second step, we consider
the medical severity of your impairment(s). If you do not have a severe
medically determinable physical or mental impairment that meets the duration
requirement of § 404.1509, or a combination of impairments that is severe and
meets the duration requirement, we will find that you are not disabled. . . .
(iii) At the third step, we also consider the medical severity of your
impairment(s). If you have an impairment(s) that meets or equals one of our
listings in appendix 1 of [subpart P of part 404 of this chapter] and meets the
duration requirement, we will find that you are disabled. . . . (iv) At the fourth
step, we consider our assessment of your residual functional capacity and your
past relevant work. If you can still do your past relevant work, we will find that
you are not disabled. . . . (v) At the fifth and last step, we consider our
assessment of your residual functional capacity and your age, education, and
work experience to see if you can make an adjustment to other work. If you can
make an adjustment to other work, we will find that you are not disabled. If
you cannot make an adjustment to other work, we will find that you are
disabled."

the ALJ determined that Wishart had medically-determinable impairments of esophageal disease, fibromyalgia, and a reading disorder but that Wishart did not have a severe impairment or combination of impairments. AR 74. Thus, because the analysis halts the moment that the claimant is found not to be disabled, the ALJ concluded that Wishart "was not disabled under sections 216(i) and 223(d) of the Social Security Act" between May 30, 2006, and June 30, 2007. AR 78. After review, the Appeals Council remanded this decision back to the ALJ.[33] AR 79

## II.   January 20, 2010: Unfavorable Decision

After a hearing on December 17, 2009, the ALJ again found that Wishart was not disabled between the alleged onset date and the date last insured. AR 19. In the January 20, 2010, decision, the ALJ again conducted the five-step sequential analysis outlined in 20 C.F.R. § 404.1520(a)(4). AR 20. At the first step, the ALJ found that Wishart did not engage in substantial gainful activity between the alleged onset date and the date last insured. AR 22. At step two, the ALJ found that Wishart's fibromyalgia was a severe impairment.

---

[33] The Appeals Council stated that Wishart had a severe impairment that would satisfy step two, and that the ALJ did not provide adequate rationale for discounting Wishart's assertions regarding his limitations. AR 80. The Appeals Council ordered the ALJ to obtain updated medical evidence, evaluate Wishart's subjective complaints and provide rationale for the credibility determination, follow the treating physician rule, and to consult with a VE if necessary. AR 80-81.

16

Additionally, the ALJ found that Wishart's esophageal problem was not "particularly problematic," and thus not severe. AR 22.

In addition, the ALJ found that Wishart's mental disorders were not severe. AR 22-24. Wishart's dyslexia and reading, mathematics, and expressive writing disorders were found not severe because Wishart claimed that he could read and understand English, did not attend special education classes as a child, continued to read the newspaper and science fiction novels, and could balance a checkbook. AR 22-23.

At step three, the ALJ determined that Wishart's impairments, singly or comprehensively considered, were not of listing severity. AR 24. Although Wishart's fibromyalgia was severe, the fibromyalgia did not singly, or in combination with Wishart's other alleged impairments, "meet or equal the requirements of any listed impairment." AR 24-25.

At step four, the ALJ determined that Wishart "had the residual functional capacity to perform the full range of light work as defined in 20 C.F.R. 404.1567(b)" between Wishart's alleged onset date and date last insured. AR 25. The ALJ utilized a two-step analytic structure, first determining whether there was an underlying "medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the claimant's pain or other symptoms," and, second, evaluating the "intensity, persistence, and limiting effects of the claimant's symptoms to determine the

17

extent to which they limit the claimant's ability to do basic work activities." AR 25.

After considering the evidence, the ALJ determined that Wishart's fibromyalgia could reasonably be expected to cause Wishart's alleged debilitation.[34] The ALJ then found that Wishart's and Claudia Young's testimony regarding the intensity, persistence, and limiting effects of these symptoms were "not credible to the extent that they [were] inconsistent with the above residual functional capacity assessment." AR 26. The ALJ also found Dr. Shah's opinion concerning Wishart's limitations lacking of credibility. AR 26. The ALJ conceded that "a finding of disability would be appropriate if [Dr. Shah's] assessment were accepted as an accurate reflection of [Wishart's] condition as of the date last insured," but asserted that Dr. Shah's opinion "inordinately [relied] on [Wishart's] less than fully credible subjective complaints rather than upon objectively identifiable clinical findings." AR 26-27. The ALJ emphasized the fact that Dr. Shah did not perform a "functional capabilities evaluation," and that Dr. Shah's treatment was mainly in the form of prescribing medication. AR 27. If Wishart's condition had actually been as

---

[34] The ALJ summarizes the debilitation as "generally [laying] in bed for 4 hours in the morning before getting up," only being able to walk two blocks, reliance upon a cane, inability to sit or stand for very long, generalized pain that reaches a 7-8 without medication and a 6 with medication, and pain-laden and stiff hands. AR 25.

severe as averred, the ALJ explained, "it would only make sense that there would have been more of a documented effort at alleviation." AR 27.

At step five, the ALJ determined that Wishart was "capable of performing past relevant work as a computer support analyst." AR 27. Thus, the ALJ concluded that Wishart "was not under a disability, as defined in the Social Security Act, at any time from May 30, 2006, the alleged onset date, through June 30, 2007, the date last insured (20 CFR 404.1520(f))." AR 27.

## STANDARD OF REVIEW

An ALJ's decision must be upheld if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g). "Substantial evidence is 'less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.' " *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Maresh v. Barnhart*, 438 F.3d 897, 898 (8th Cir. 2006)); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971) (reasoning that substantial evidence means "more than a mere scintilla"). In determining whether substantial evidence supports the ALJ's decision, the court considers evidence that both supports and detracts from the ALJ's decision. *Moore v. Astrue*, 623 F.3d 599, 605 (8th Cir. 2010) (internal citation omitted). As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have determined

19

the case differently. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)).

In determining whether the Commissioner's decision is supported by substantial evidence, the court reviews the entire administrative record and considers six factors: (1) the ALJ's credibility determinations; (2) the claimant's vocational factors; (3) medical evidence from treating and consulting physicians; (4) the claimant's subjective complaints relating to activities and impairments; (5) any third-party corroboration of claimant's impairments; and (6) a vocational expert's testimony based on proper hypothetical questions setting forth the claimant's impairment(s). *Stewart v. Sec'y of Health & Human Servs.*, 957 F.2d 581, 585-86 (8th Cir. 1992) (citing *Cruse v. Bowen*, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The court also reviews the Commissioner's decision to determine if an error of law has been committed, which may be a procedural error, the use of an erroneous legal standard, or an incorrect application of the law. *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (citations omitted). Issues of law are reviewed de novo with deference accorded to the Commission's construction of the Social Security Act. *See Smith v. Sullivan*, 982 F.2d 308, 311 (8th Cir. 1992).

20

## DISCUSSION

Wishart argues that the ALJ erred by discounting the treating physician's opinions and by improperly evaluating Wishart's credibility. After reviewing the record, the court concludes that Wishart's arguments lack merit.

### I. The Treating Physician Rule

Wishart argues that the ALJ improperly discounted the treating physician's opinion. A treating physician's opinion on the nature and severity of the claimant's impairments is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). "A treating physician's opinion 'do[es] not automatically control, since the record must be evaluated as a whole.' " *Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (quoting *Bentley v. Shalala*, 52 F.3d 784, 786 (8th Cir. 1995)). An ALJ may "discount or even disregard the opinion of a treating physician where . . . a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000) (citations omitted). The ALJ must always give good reasons for the weight afforded to a treating physician's evaluation. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000).

21

In the present case, the ALJ did not grant Dr. Shah's opinions concerning Wishart's occupational limitations controlling weight because the opinions were inconsistent with substantial evidence in the record.[35] AR 27. The ALJ initially pointed out that Dr. Shah's opinions rely on Wishart's "less than fully credible subjective complaints."[36] AR 27. Wishart argues, and is correct in doing so, that Dr. Shah needed to rely on Wishart's subjective complaints, particularly because Wishart was diagnosed with fibromyalgia. *See Garza v. Barnhart*, 397 F.3d 1087, 1089 (8th Cir. 2005) (noting that the ALJ misunderstood fibromyalgia when he indicated that objective medical testing was necessary since it is usually diagnosed through subjective complaints). But the ALJ did not dispute whether Wishart has fibromyalgia; he disputed the extent of Wishart's disorder.

The ALJ determined that Dr. Shah's opinion concerning the extent of Wishart's fibromyalgia was not supported by the record. The ALJ reasoned that because Dr. Shah only treated Wishart with medications and failed to perform

---

[35] The ALJ focused on Dr. Shah's opinions from the Multiple Impairment Questionnaire, AR 330-36, that Wishart "could only sit about 2-3 hours and stand about 1-2 hours out of an 8-hour workday," "would require frequent breaks of undetermined duration, "would be expected to miss work more than 3 times per month," "should engage in no pushing, pulling, kneeling, bending, or stopping," could not keep his neck in a constant position, and was limited in reaching "with the bilateral upper extremities." AR 26-27.

[36] Wishart's credibility is discussed in detail in the next section and thus will not be touched on here.

any functional capabilities evaluation, Dr. Shah's opinion regarding the seriousness of the fibromyalgia lacked foundation. AR 27. Further, Dr. Shah's notes and Wishart's testimony do not indicate that Dr. Shah limited Wishart's activities, with the exception of telling Wishart to avoid "hard impact kind of things."[37] AR 48, 52. Dr. Shah makes no mention within his notes of any limitations on Wishart's ability to sit or perform sedentary tasks. Moreover, Dr. Shah's notes from an appointment with Wishart shortly after the alleged onset date[38] indicate that Wishart's pain was "3/10 in intensity most of the time." AR 316. The totality of the evidence in the record conflicts with the extreme limitations Dr. Shah suggests in his Multiple Impairment Questionnaire. AR 330-36. Thus, the ALJ was within his authority in deciding to give Dr. Shah's opinion little weight. *See Choate v. Barnhart*, 457 F.3d 865, 870 (8th Cir. 2006) (finding that the ALJ was permitted to disregard claimant's treating physician's opinion when it was unsupported by other evidence in the record, specifically when treating physician failed to place any limitations on claimant's activities prior to disability filing).

---

[37]In fact, Wishart testified that he has been advised to get as much exercise as he can. AR 48.

[38]The onset date was May 30, 2006. Dr. Shah's notes indicate that this appointment took place on August 9, 2006. AR 316.

## II.     Wishart's Credibility Evaluation

Wishart also argues that the ALJ erred by improperly evaluating the credibility of Wishart's statements concerning Wishart's limitations. In weighing a claimant's subjective complaints of pain, the ALJ should analyze the factors set out in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). Under *Polaski*, "[t]he adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: 1. the claimant's daily activities; 2. the duration, frequency and intensity of the pain; 3. precipitating and aggravating factors; 4. dosage, effectiveness and side effects of medication; 5. functional restrictions." *Id.*; *see also Choate v. Barnhart*, 457 F.3d 865, 871 (8th Cir. 2006). The ALJ need not, however, "discuss each *Polaski* factor as long as the analytical framework is recognized and considered." *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004). Additional considerations include the claimant's relevant work history and the absence of objective medical evidence to support the severity of claimant's symptoms. *Choate*, 457 F.3d at 871.

After considering the *Polaski* factors, the ALJ must make an "express credibility determination." *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004). Inconsistencies between the claimant's subjective complaints and the evidence as a whole may warrant an adverse credibility finding. *Pelkey v.*

24

*Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006). The ALJ must state why the record as a whole supports an adverse credibility determination. *Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006). The court " 'will not disturb the decision of an ALJ who considers, but for good cause expressly discredits, a claimant's complaints of disabling pain.' " *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005) (citation omitted).

Here, the ALJ concluded that Wishart's statements regarding the extent of his fibromyalgia (i.e., the intensity, persistence, and limiting effects of the disorder) were not credible because they were inconsistent with other evidence used in making the residual functional capacity assessment. AR 26. The first factor that the ALJ discussed was Wishart's prior work history. AR 26. The ALJ noted that between 1997 and 2006 Wishart had marginal yearly income with three years of no recorded income. AR 26. Although Wishart acknowledges that he had been diagnosed with fibromyalgia prior to 1997, he has not provided legitimate reasons for why he failed to generate substantial income between 1997 and 2006. AR 231. In fact, a medical history report from 1998 indicates that Wishart engaged in "mild aerobics, mostly stretching, bicycling, and walking" four to five times per week. AR 281. A separate medical history report from 1998 noted that Wishart "feels as though he can return to work" and that "his pain is at a manageable level." AR 284. Despite the promising medical

25

reports, Wishart failed to earn any income in 1998, 2001, or 2002. AR 160.[39]
Wishart's poor work history coupled with the medical reports, in which Wishart
admits that he was capable of working, support the ALJ's adverse finding
regarding Wishart's history of failing to work despite having the capacity to do
so. *Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006) (noting that an overall
poor work record can assist an ALJ in his credibility finding).

    Next, the ALJ determined that Wishart's testimony regarding the extent
of his pain was inconsistent with other evidence in the record. AR 26. Wishart
testified that his pain level is generally between 6/10 and 8/10 with or without
medication. AR 41. As noted above, Dr. Shah's notes from an appointment with
Wishart shortly after the onset date indicate that Wishart's pain was "3/10 in
intensity most of the time." AR 316. This inconsistency speaks directly to
Wishart's credibility. *See Goodale v. Halter*, 257 F.3d 771, 774 (8th Cir. 2001)
(noting that an ALJ may discount subjective complaints if there are
inconsistencies in the evidence as a whole).

    The ALJ also pointed to the fact that Wishart worked several months as a
Schwan's delivery man just prior to the onset date and then continued to work
part-time as a newspaper delivery man following the onset date. The medical
records show no indication of deterioration following employment with

---

[39] Furthermore, there are no medical records between May 1998 and
June 2003. It stands against reason that Wishart was in such extreme pain as
to not be able to work at all in three separate years, yet failed to see a doctor.

Schwan's aside from Wishart's complaints that he experienced more pain when engaging in physical activity. AR 318. Indeed, a few months after Wishart quit his Schwan's job, he indicated that his pain level was 3/10 most of the time. AR 316. Thus, the ALJ relied on evidence in the record to support his statement that "[Wishart's] ability to work over several months in a very physically active position is not especially consistent with his claim that he could not come close to fulfilling the demands of even sedentary work as of the alleged onset date." AR 26. *See Schultz v. Astrue*, 479 F.3d 979, 982-83 (8th Cir. 2007) ("Absent a showing of deterioration, working after the onset of an impairment is some evidence of an ability to work.").

In sum, the ALJ sufficiently stated why the record as a whole supported an adverse credibility finding. He noted Wishart's poor prior work history, inconsistencies between Wishart's testimony and prior medical reports, and inconsistencies between Wishart's assertions of what jobs he was capable of performing and what jobs he actually performed. Therefore, the court will not disturb the decision of the ALJ pertaining to Wishart's credibility. *See Goff*, 421 F.3d at 792.

**CONCLUSION**

Following review of the record, the court finds that substantial evidence supports the ALJ's findings that gave little weight to Wishart's treating physician's opinion. Also, substantial evidence supports the ALJ's finding that

27

Wishart's subjective complaints were not credible. Lastly, the court concludes that substantial evidence supports the ALJ's determination that Wishart was not disabled during the applicable date range. Accordingly, it is

ORDERED that the motion to reverse the decision of the Commissioner is denied, and the decision of the Commissioner is affirmed.

Dated August 21, 2012

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE

28